# **EXHIBIT E**

**Positive**
As of: December 8, 2023 6:00 PM Z

# Savage v. Galaxy Media & Mktg. Corp.

United States District Court for the Southern District of New York

July 5, 2012, Decided; July 5, 2012, Filed

11 Civ. 6791 (NRB)

**Reporter**
2012 U.S. Dist. LEXIS 93944 *; 2012 WL 2681423

GARY SAVAGE, Plaintiff, - against - GALAXY MEDIA & MARKETING CORP.; CHARLSTON KENTRIST 41 DIRECT, INC.; JOHN THOMAS BRIDGE AND OPPORTUNITY FUND, LP; JOHN THOMAS CAPITAL MANAGEMENT GROUP, LLC; and JOHN THOMAS FINANCIAL, INC., Defendants.

**Subsequent History:** Affirmed by, Motion denied by, Without prejudice Savage v. Galaxy Media & Mktg. Corp., 2013 U.S. App. LEXIS 9315 (2d Cir. N.Y., May 8, 2013)

## Core Terms

allegations, dominated, lenders, investors, funding, tortious interference, economic interest, breaching, purposes, corporate veil, appointment, resignation, financing, promised, Pierced, bridge, merger, salary, employment agreement, shareholder, borrowers, pertain

## Case Summary

### Overview
The dismissal of plaintiff's diversity action against defendants alleging tortious interference with contract, breach of contract, and violations of the New York Labor Law was proper, in part because plaintiff was unable to pierce the corporate veil. The allegations were too thin to overcome the law's reluctance to discard the corporate form, and they were particularly insufficient because they related only to actions expected of shareholders and creditors.

### Outcome
Defendants' motions to dismiss granted.

## LexisNexis® Headnotes

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Evidence > Inferences & Presumptions > Inferences

Civil Procedure > ... > Pleadings > Complaints > General Overview

**HN1[ ] Motions to Dismiss, Failure to State Claim**

When deciding a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), the court must accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences in plaintiff's favor. The courts need not, however, accept as true mere conclusions of law or unwarranted deductions of fact. A complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. Where a plaintiff has not nudged its claims across the line from conceivable to plausible, its complaint must be dismissed.

Contracts Law > Contract Formation > Consideration > General Overview

Contracts Law > Statute of Frauds > Requirements > Writings

**HN2[ ] Contract Formation, Consideration**

When unsupported by new consideration, contracts to answer for the debt of another must be in writing or they are void, N.Y. Gen. Oblig. Law § 5-701(2).

Business & Corporate Law > ... > Management

2012 U.S. Dist. LEXIS 93944, *93944

Duties & Liabilities > Causes of Action > Fraud & Misrepresentation

Business & Corporate Law > ... > Shareholder Duties & Liabilities > Piercing the Corporate Veil > General Overview

**HN3[⬇] Causes of Action, Fraud & Misrepresentation**

Under New York law, corporate entities are presumed to be distinct, and New York courts are at best reluctant to disregard that separateness. New York law disfavors disregard of the corporate form. However, a corporate veil may be pierced if a plaintiff shows that (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury. In piercing the corporate veil, a plaintiff bears a heavy burden of showing that the corporation was dominated as to the transaction attacked and that such domination was the instrument of fraud or otherwise resulted in wrongful or inequitable consequences.

Business & Corporate Law > ... > Piercing the Corporate Veil > Alter Ego > General Overview

**HN4[⬇] Piercing the Corporate Veil, Alter Ego**

Nevada permits piercing the corporate veil only when the corporation is acting as the alter ego of a controlling individual. A plaintiff must thus show, among other things, that there is such unity of interest and ownership that one entity is inseparable from the other. This standard is higher than New York's for veil-piercing and akin to New York's alter-ego standard.

Business & Corporate Law > ... > Shareholder Duties & Liabilities > Piercing the Corporate Veil > General Overview

Business & Corporate Law > ... > Management Duties & Liabilities > Causes of Action > General Overview

**HN5[⬇] Shareholder Duties & Liabilities, Piercing the Corporate Veil**

Some courts have held that a corporate veil may be pierced without a showing of fraud or wrongdoing in the limited circumstance where one corporation has been so dominated by another corporation and its separate entity so ignored that it primarily transacts the dominator's business instead of its own and can be called the other's alter ego. Equitable ownership is the theory of alter-ego liability applied to non-shareholders.

Business & Corporate Law > ... > Shareholder Duties & Liabilities > Piercing the Corporate Veil > General Overview

Business & Corporate Law > ... > Management Duties & Liabilities > Causes of Action > General Overview

Business & Corporate Law > ... > Piercing the Corporate Veil > Alter Ego > General Overview

**HN6[⬇] Shareholder Duties & Liabilities, Piercing the Corporate Veil**

The following are factors useful in determining whether one company has dominated another: (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like; (2) inadequate capitalization; (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the amount of business discretion displayed by the allegedly dominated corporation; (7) whether the related corporations deal with the dominated corporation at arms length; (8) whether the corporations are treated as independent profit centers; (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group; and (10) whether the corporation in question had property that was used by other of the corporations as if it were their own. Allegations about a factor that are purely conclusory are insufficient to warrant consideration.

Business & Corporate Law > ... > Piercing the Corporate Veil > Alter Ego > General Overview

Business & Corporate Law > ... > Management Duties & Liabilities > Causes of Action > General Overview

**HN7[↓] Piercing the Corporate Veil, Alter Ego**

Lenders must be able to exercise a meaningful degree of control over their borrowers when their interest is at stake without fear of being held liable for obligations incurred by the borrower. A contrary result would disincentivize lending to all but the least risky of ventures and would, quite simply, be unfair to lenders. Veil-piercing should be employed to achieve equity and depends on the attendant facts and equities. Veil-piercing is appropriate only when the company has abused the privilege of doing business in the corporate form.

Civil Procedure > ... > In Rem & Personal Jurisdiction > In Personam Actions > General Overview

**HN8[↓] In Rem & Personal Jurisdiction, In Personam Actions**

Lumping all the defendants together for purposes of alleging personal jurisdiction is patently insufficient.

Business & Corporate Law > ... > Shareholder Duties & Liabilities > Piercing the Corporate Veil > General Overview

Business & Corporate Law > ... > Piercing the Corporate Veil > Alter Ego > General Overview

**HN9[↓] Shareholder Duties & Liabilities, Piercing the Corporate Veil**

Even complete ownership of a subsidiary's stock is insufficient, by itself, to pierce the corporate veil because actual domination, rather than the opportunity to exercise control, must be shown.

Business & Corporate Law > ... > Shareholder Duties & Liabilities > Piercing the Corporate Veil > General Overview

**HN10[↓] Shareholder Duties & Liabilities, Piercing the Corporate Veil**

Inadequate capitalization is fairly meaningless in a nonparent/subsidiary relationship. A number of standard piercing the veil factors to be used in the case of related firms have little direct bearing on paradigmatic relationships between lenders and borrowers.

Business & Corporate Law > ... > Shareholder Duties & Liabilities > Piercing the Corporate Veil > General Overview

Business & Corporate Law > ... > Piercing the Corporate Veil > Alter Ego > General Overview

**HN11[↓] Shareholder Duties & Liabilities, Piercing the Corporate Veil**

Actual domination of a corporation is required rather than the opportunity to exercise control.

Torts > ... > Contracts > Intentional Interference > Elements

**HN12[↓] Intentional Interference, Elements**

There are five elements to a claim of tortious interference with an existing contract under New York law: the plaintiff must show 1) the existence of its valid contract with a third party; 2) defendant's knowledge of that contract; 3) defendant's intentional and improper procuring of; 4) a breach; and 5) damages. The test requires that the breach of the contract would not have occurred but for the defendant's conduct. Rather than perform a choice-of-law analysis, courts may defer to the parties' chosen law. A defendant may assert in response to this claim the economic interest affirmative defense, that it acted to protect its own legal or financial stake in the breaching party's business, which has been applied in situations where defendants were significant stockholders in the breaching party's business and where defendant was the breaching party's creditor. The defense will not lie if there has been a showing of malice or illegality.

Torts > ... > Commercial Interference > Contracts > General Overview

2012 U.S. Dist. LEXIS 93944, *93944

**HN13**[ ] **Commercial Interference, Contracts**

A company's predisposition toward breaching the contract even in the absence of the alleged interference precludes a finding of causation.

> Civil Procedure > Pleading & Practice > Pleadings > General Overview
>
> Torts > ... > Contracts > Intentional Interference > Elements

**HN14**[ ] **Pleading & Practice, Pleadings**

Some factual specificity in pleading tortious interference is required.

> Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > General Overview
>
> Civil Procedure > ... > Pleadings > Complaints > General Overview

**HN15**[ ] **Defenses, Demurrers & Objections, Affirmative Defenses**

Affirmative defenses may be considered on motions to dismiss if they appear on the face of the complaint.

**Counsel:** [*1] For Gary Savage, Plaintiff: Ethan Andrew Brecher, Samantha Lynn Plesser, Liddle & Robinson, LLP, New York, NY.

For John Thomas Bridge and Opportunity Fund, LP, John Thomas Capital Management Group, LLC, Defendants: Jessica R. Quinn-Horgan, PRO HAC VICE, Law Offices of Jessica Quinn-Horgan, Pittsburgh, PA; Shawn Randall Fox, McGuireWoods LLP (NYC), New York, NY.

For John Thomas Financial, Inc., Defendant: Eric Robert Stern, LEAD ATTORNEY, Sacks & Sacks, LLP, New York, NY; Robert Marc Bursky, Robert M. Bursky, Melville, NY.

**Judges:** NAOMI REICE BUCHWALD, UNITED STATES DISTRICT JUDGE.

**Opinion by:** NAOMI REICE BUCHWALD

**Opinion**

MEMORANDUM AND ORDER

NAOMI REICE BUCHWALD

UNITED STATES DISTRICT JUDGE

Plaintiff Gary Savage brings this diversity action alleging tortious interference with contract, breach of contract, and violations of the New York Labor Law. Defendants John Thomas Financial, Inc. ("JTF"), John Thomas Bridge and Opportunity Fund, LP (the "Fund"), and John Thomas Capital Management Group, LLC (the "Group") (together, the "JT Defendants") have moved pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the claims against them.[1]

For the reasons stated herein, the JT Defendants' motions are granted.

BACKGROUND[2]

---

[1] Defendants Galaxy Media & Marketing Corp. ("Galaxy") and Charlston Kentrist 41 [*2] Direct, Inc. ("CK41") have not answered, moved against, or otherwise responded to the complaint.

[2] These facts are derived from the complaint and the documents incorporated by reference therein. See DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010). To the extent the allegations in the complaint are well-pleaded, we accept them as true for the purposes of this motion. See Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007). We also refer to public filings, the fact -- though not the truth -- of which we are permitted to take judicial notice on a motion to dismiss. See Staehr v. Harford Fin. Servs. Grp., Inc., 547 F.3d 406, 425 (2d Cir. 2008).

The complaint references the substance of several security agreements between the defendants. Plaintiff has asked that, if we need to rely on provisions of these documents not discussed in the complaint, we convert the instant motion to one for summary judgment under Rule 12(d) and deny that motion pursuant to **Rule 56(d)** so that discovery on the agreements may be pursued. Because the complaint discusses a significant portion of the [*3] substance and effect of the agreements, we may have been able to rely on them

2012 U.S. Dist. LEXIS 93944, *3

## I. The Parties

CK41 is a Nevada corporation for which plaintiff, a resident of New Jersey, began consulting in 2009. By April of that year, plaintiff had been hired as CK41's president and chief executive officer ("CEO").

CK41 merged with Amber-Ready, Inc. ("Amber") on April 8, 2010. As a result of the merger, Amber became the parent of CK41 and changed its name to Galaxy. After the merger plaintiff retained his titles with CK41 and was made the president and CEO of Galaxy, as well as a member of Galaxy's board of directors. Galaxy, a Nevada corporation with its principal place of business in New York, [*4] develops and markets products -- in particular, an acne treatment known as purEffect.

JTF is a privately held financial services firm organized and located in New York that provides individual brokerage and investment banking services. In the wake of the merger, Galaxy engaged JTF to obtain long-term funding for the company. Anastasios Belesis is JTF's CEO, and he allegedly promised plaintiff upon Galaxy's formation in 2010 that JTF would raise $1.3 million in equity to finish developing television commercials for purEffect and would utilize its best efforts to raise at least $6 million to launch the product.

The Fund is a Delaware limited partnership managed by the Group, an investment company formed under Delaware law and based in Texas.[3] George Jarkesy, Jr. is the managing member of the Group. Plaintiff alleges that the Fund promised him that, while JTF pursued long-term funding for Galaxy, the Fund would assist the company by providing bridge loans to finance it.

The JT Defendants are not alleged to have had any connection to CK41 or Galaxy prior to the merger.

## II. Plaintiff's Employment Agreements with CK41 and Galaxy

Plaintiff entered into a written employment agreement with CK41 in April 2009 (the "CK41 Agreement"). The agreement made plaintiff the president and CEO of CK41, which positions gave him "primary responsibility for the business of the Company, including all activities related to the promotion, advertising, sale and marketing of the Company's products and all creative, packaging, and product fulfillment activities of the Company." (Compl. ¶ 17.) The CK41 Agreement granted plaintiff 15.5 million shares of CK41's common stock[4] and provided for a base salary of $275,000, to be paid in bi-monthly installments, with various increases upon reaching certain milestones, as well as incentive and discretionary bonuses. Moreover, it obligated CK41 to obtain and maintain directors and officers ("D&O") insurance covering plaintiff.

The CK41 Agreement commenced plaintiff's employment as of April 1, 2009 and was effective for three years unless an extension was granted, though it permitted plaintiff to terminate his employment for good reason upon provision of a thirty-day cure period. The agreement articulated a number of grounds that would constitute good reason for plaintiff's resignation. Relevantly, the agreement noted that resignation would be appropriate "if, without [plaintiff's] consent," (a) his salary, benefits, or other compensation were reduced, (b) he was assigned any duties "inconsistent with [his] position and status as set forth in this Agreement," or (c) CK41 materially breached the agreement. (Compl. ¶ 26.)

Plaintiff signed another employment agreement with Galaxy in March 2010 (the "Galaxy Agreement"),[5] which

---

without converting the instant motion, see DiFolco, 622 F.3d at 111, but no party has provided them to us. Although the terms of the agreements are described in certain regulatory filings, as noted above we cannot rely on those filings for their truth. See Staehr, 547 F.3d at 425. We are thus limited to considering the representations about those agreements in the complaint. Consequently, we deny as moot plaintiff's requests to convert this motion to one for summary judgment and for discovery under **Rule 56(d)**.

[3] As discussed further infra, the Group and the Fund have been at pains to emphasize that they are wholly separate entities from JTF and have simply licensed use of the "John Thomas" name. Plaintiff, however, disputes this [*5] characterization, alleging that JTF controls the Group and the Fund and that it had the power to direct to whom the Fund would provide loans. (Compl. ¶¶ 16, 44, 57.)

[4] After the merger, these shares would have been converted [*6] to approximately 5.9 million shares of Galaxy common stock. See Galaxy Media & Marketing Corp., Form S-1/A ("Galaxy S-1/A"), at 2 (Feb. 11, 2011).

[5] The complaint alleges both that this agreement was signed with Galaxy in March 2010 and that Amber changed its name to Galaxy after the merger in April 2010. In light of these contradictory allegations, we assume that the agreement was

2012 U.S. Dist. LEXIS 93944, *6

contained provisions similar to those in the CK41 Agreement (id. ¶¶ 13, 28), except the three-year term under the agreement with Galaxy began on March 1, 2010. The Galaxy Agreement further provided that, if plaintiff resigned for good reason before [*7] the end of his three-year term, Galaxy would owe him "the full balance remaining on the contract including all terms and benefits contained herein."[6] (Id. ¶ 34.)

None of the JT Defendants is alleged to have been a party to these agreements or involved in any way with their negotiation.

### III. Events Leading to Plaintiff's Resignation

Plaintiff [*8] alleges that, by 2010, CK41 had failed to pay him the money he was due under the CK41 Agreement by a significant margin. Amber, the predecessor to Galaxy, was apparently having its own financial difficulties at the same time. (Pl.'s Mem. of Law in Opp'n to Defs.' Mots. to Dismiss ("Pl.'s Opp'n") 2 (noting that Amber "had tried unsuccessfully to sell a technology that helped locate missing children").) When the companies merged and created Galaxy, JTF was enlisted to secure long-term financing through investors, and the Group and the Fund were brought in to provide interim financing to ensure the Galaxy could continue operations.

The complaint does not detail the months immediately following the merger, but it does allege that the JT Defendants had begun funding Galaxy's operations by October 2010, when -- without seeking approval from plaintiff -- they appointed Steven Plumb to be Galaxy's Chief Financial Officer ("CFO"). Plaintiff was allegedly required by the JT Defendants to have Plumb cosign every check and wire transfer. Moreover, plaintiff

---

actually signed with Amber, but we refer to it as having been signed with Galaxy for ease of discussion.

Additionally, while the complaint does not specify what effect the Galaxy Agreement had on the CK41 Agreement, it does allege that, as of September 2011, CK41 only owed plaintiff unpaid salary from 2009. (Compl. ¶¶ 32, 73.) We infer, therefore, that the Galaxy Agreement replaced the CK41 Agreement and that obligations did not accrue under both simultaneously.

[6] The Galaxy Agreement, though ostensibly not the CK41 Agreement, also provided for benefits such as medical insurance payments and "automobile allowances." (Compl. ¶ 33.)

alleges that, when he or Plumb submitted bills for payment, the JT Defendants would decide how to allocate money to Galaxy and which creditors [*9] would be paid.

Plaintiff further asserts that between September 2010 and his resignation on July 16, 2011, he was paid none of the money he was due under the Galaxy Agreement. In particular, plaintiff alleges, after his appointment and at the direction of the JT Defendants, Plumb refused to pay plaintiff any money, even when requested by plaintiff to do so. Belesis allegedly promised plaintiff at multiple points between December 2010 and May 2011 that JTF would pay him $50,000 on a semi-monthly basis until the deficit was paid off, but no such payments were ever made.

In addition to exerting influence over Galaxy's finances, the JT Defendants allegedly manipulated the company's January 5, 2011 shareholder vote.[7] Prior to that vote, plaintiff alleges that JTF had its brokers call Galaxy stockholders to tell them whom to vote off the board of directors. Moreover, plaintiff asserts that the JT Defendants threatened him by refusing to fund the purEffect development if plaintiff did not also vote for the directors they had approved. After the vote, the JT Defendants allegedly controlled three of the five board members, including Plumb, who was appointed chairman of the board.

In February 2011, Galaxy issued its second amendment to its form S-1 registration statement. That amendment indicates that Galaxy had been incurring losses, was running a multi-million dollar working capital deficit, and did not have enough cash to cover operating expenses.[8] See Galaxy S-1/A, at 13. That same month, plaintiff and Plumb signed an agreement with JTF under which JTF would immediately provide Galaxy with $1,350,000. JTF allegedly did not raise the money from investors but rather directed the Fund to provide Galaxy

---

[7] The complaint [*10] alleges that the vote occurred in 2010 (Compl. ¶ 51), but plaintiff has noted that this and related dates are typographical errors. (Pl.'s Opp'n 8 n.8.)

[8] The registration amendment also represents that the Fund held 43.18% of Galaxy's common stock, about 22.7 million shares, making the Fund Galaxy's largest shareholder, and that JTF owned several hundred thousand shares of the company. See Galaxy S-1/A, at 29, 36. Belesis also allegedly owns two million shares [*11] of Galaxy through a holding company.

2012 U.S. Dist. LEXIS 93944, *11

with $500,000 in bridge loans. In addition to this payment, the Fund allegedly made payments directly to Galaxy's creditors. Galaxy was, however, required to sign bridge loan agreements for the transfers.

Plaintiff further alleges that, in subsequent months, the JT Defendants met with current and potential Galaxy investors without plaintiff's knowledge. In or around June 2011, Belesis allegedly promised one current investor that Galaxy -- which had no funds at the time -- would immediately repay the investor's loan balance and interest, totaling approximately $1.7 million. Around the same time, Belesis allegedly represented to another investor that the JT Defendants were responsible for funding Galaxy and raising money from potential investors.

On June 17, 2011, the Securities & Exchange Commission (the "SEC") initiated an investigation into Galaxy. Belesis retained his personal attorney, Mitchell Schuster, Esq., to represent Galaxy in that investigation. Approximately two months later, however, Schuster recognized the "ostensible conflict of interest in representing both Mr. Belesis personally and Galaxy" (Compl. ¶ 66) and withdrew from representing Galaxy in at least one lawsuit.

Citing Galaxy's failure to pay his salary and the reduction of his powers under the agreements as a result of Plumb's appointment as CFO, plaintiff tendered his resignation [*12] on July 16, 2011. Galaxy did not cure these defects within the thirty-day cure period, and, on August 15, 2011, plaintiff's termination of his employment became effective.[9]

## DISCUSSION

### I. Legal Standards

HN1[↑] When deciding a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences in plaintiff's favor. See

Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007). We need not, however, accept as true mere "conclusions of law or unwarranted deductions of fact." First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 771 (2d Cir. 1994) (internal quotation marks omitted).

A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) [*13] (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). Where a plaintiff has not "nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." Twombly, 550 U.S. at 570.

### II. Breach of Contract

Plaintiff argues that CK41 and Galaxy breached their agreements with him by their failures to pay him the amounts he was owed and -- though not specifically claimed in the complaint -- Galaxy's failure to pay his D&O insurance and reduction of his responsibilities. Plaintiff acknowledges that none of the JT Defendants were parties to either the CK41 Agreement or the Galaxy Agreement,[10] but he contends that that they all dominated and controlled CK41 and Galaxy such that the JT Defendants are liable under a theory of veil-piercing.

HN3[↑] Under New York law,[11] corporate entities are

---

[9] Plaintiff further alleges that, while the Fund had the sole responsibility for paying the premiums on CK41's and Galaxy's D&O insurance policies, it refused to pay the premiums on Galaxy's policy after August 24, 2011, exposing its former directors and officers -- including plaintiff -- to potential liability.

[10] Although it is not enumerated as a cause of action, to the extent the complaint can be read to assert a claim for breach of oral contract against JTF for Belesis's promise to pay plaintiff's salary (Compl. ¶ 41), that claim fails. HN2[↑] When unsupported by new consideration, contracts to answer for the debt of another must be in writing or they are void. See N.Y. Gen. Oblig. L. § 5-701(2); Perini v. Sabatelli, 861 N.Y.S.2d 68, 68, 52 A.D.3d 588, 588-89 (N.Y. App. Div. 2d Dep't 2008). [*14] Plaintiff has not alleged that he provided any such consideration.

[11] CK41 and Galaxy are Nevada corporations, and therefore we would ordinarily apply Nevada's law regarding veil-piercing to this analysis. See Sweeney, Cohn, Stahl & Vaccaro v. Kane, 773 N.Y.S.2d 420, 423, 6 A.D.3d 72, 75 (N.Y. App. Div. 2d Dep't 2004); Sykes v. Mel Harris & Assocs., LLC, 757 F. Supp. 2d 413, 430 (S.D.N.Y. 2010). Because the parties have cited only New York law, however, we utilize a New York framework. See Cobalt Partners, L.P. v. GSC Capital Corp.,

presumed to be distinct, see Morris v. N.Y. State Dep't of Taxation & Fin., 82 N.Y.2d 135, 140, 623 N.E.2d 1157, 603 N.Y.S.2d 807 (1993), and New York courts are at best reluctant to disregard that separateness, see Cobalt Partners, L.P. v. GSC Capital Corp., 97 A.D.3d 35, 944 N.Y.S.2d 30, 33 (N.Y. App. Div. 1st Dep't 2012) ("New York law disfavors disregard of the corporate form."); Gartner v. Snyder, 607 F.2d 582, 586 (2d Cir. 1979). However, a corporate veil may be pierced if a plaintiff shows that (1) "the owners exercised complete domination of the corporation in respect to the transaction attacked," and (2) "such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury."[12] Cobalt Partners, 97 A.D.3d 35, 944 N.Y.S.2d 30, 33 n.1 (N.Y. App. Div. 1st Dep't 2012) (citing M&A Oasis, Inc. v. MTM Assocs., L.P., 764 N.Y.S.2d 9, 12, 307 A.D.2d 872, 874 (N.Y. App. Div. 1st Dep't 2003)); Key Items, Inc. v. Ultima Diamonds, Inc., No. 09 Civ. 3729, 2011 U.S. Dist. LEXIS 111524, at *17-18 n.5 (S.D.N.Y. Sept. 29, 2011).

Even were we to apply the law of Nevada, however, our conclusions would not differ. HN4[↑] That state permits piercing the corporate veil only when "the corporation is acting as the alter ego of a controlling individual." LFC Mktg. Grp., Inc. v. Loomis, 116 Nev. 896, 8 P.3d 841, 845 (N.V. 2000); [*16] see also Truck Ins. Exchange v. Palmer J. Swanson, Inc., 124 Nev. 629, 189 P.3d 656, 660 (2008). A plaintiff must thus show, among other things, that there is "such unity of interest and ownership that one [entity] is inseparable from the other." LFC, 8 P.3d at 846. This standard is higher than New York's for veil-piercing and akin to New York's alter-ego standard. As discussed herein, we find that plaintiff's allegations fail under both of these theories, and so they would also fail under Nevada law.

[12] Plaintiff suggests that the JT Defendants may be liable under either an alter-ego or equitable-ownership theory. HN5[↑] Some courts have held that a corporate veil may be pierced without a showing of fraud or wrongdoing in the limited circumstance where one corporation "has been so dominated by . . . another corporation and its separate entity so ignored that it primarily transacts the dominator's business instead of its own and can be called the other's alter ego." Fernbach, LLC v. Calleo, 939 N.Y.S.2d 501, 503, 92 A.D.3d 831, 832 (N.Y. App. Div. 2d Dep't 2012) (quoting Island Seafood Co. v. Golub Corp., 759 N.Y.S.2d 768, 769, 303 A.D.2d 892, 893 (N.Y. App. Div. 3d Dep't 2003)). Equitable ownership is the [*17] theory of alter-ego liability applied to non-shareholders. See Freeman v. Complex Computing Co., 119 F.3d 1044, 1051 (2d Cir. 1997).

Plaintiff has not alleged that the JT Defendants disregarded the corporate form so completely as to use either CK41 or 944 N.Y.S.2d at 33(quoting Morris, 82 N.Y.2d at 141); see also TNS Holdings, Inc. v. MKI Sec. Corp., 92 N.Y.2d 335, 339, 703 N.E.2d 749, 680 N.Y.S.2d 891 (1998) (in piercing the corporate veil, a plaintiff "bear[s] a [*15] heavy burden of showing that the corporation was dominated as to the transaction attacked and that such domination was the instrument of fraud or otherwise resulted in wrongful or inequitable consequences").

The Second Circuit has articulated a number of HN6[↑] factors useful in determining whether one company has dominated another:

> (1) the absence of the formalities and paraphernalia [*18] that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were [their] own.

Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc., 933 F.2d 131, 139 (2d Cir. 1991); see also Freeman v. Complex Computing Co., 119 F.3d 1044,

Galaxy to run their own businesses. Cf. id. (equitable ownership requires exercising authority over a company "to the point of completely disregarding the corporate form and acting as though [its] assets [are the defendant's] alone to manage and distribute" (internal quotation marks omitted)). There are, in fact, no allegations whatsoever that CK41 and Galaxy were used in any way in the JT Defendants' investment businesses. Rather, plaintiff alleges that, among other things, the JT Defendants "participated in the business actions of CK 41 and Galaxy" (Compl. ¶ 46), the Fund paid Galaxy's vendors (id. ¶ 58), and Belesis spoke with investors about purEffect (id. ¶ 62). The alter-ego and equitable-ownership theories of veil-piercing are thus inapplicable to the instant case.

2012 U.S. Dist. LEXIS 93944, *18

1053 (2d Cir. 1997)). Allegations about a factor that are "purely conclusory" are insufficient to warrant consideration. Ningbo Prods. Imp. & Exp. Co. v. Eliau, No. 11 Civ. 650, 2011 U.S. Dist. LEXIS 125789, at *17 (S.D.N.Y. Oct. 31, 2011) [*19] (internal quotation marks and alteration omitted).

### A. The Corporate Veil May Not Be Pierced for Purposes of the CK41 Agreement as to Any of the JT Defendants

The complaint contains no allegations with respect to CK41's alleged negative treatment of plaintiff that implicate any of the JT Defendants. Chronologically, the first allegation in the complaint pertinent to the JT Defendants is that Belesis promised plaintiff "at the time that Galaxy was formed" that JTF would raise funding for Galaxy (Compl. ¶ 15), and the only nonconclusory allegation indicating that the JT Defendants interacted with CK41 after that point is that they paid the premiums on CK41's D&O insurance (id. ¶ 35). All other relevant allegations pertain solely to Galaxy.

Additionally, none of the allegations about the JT Defendants' conduct after the merger are relevant "to the transaction attacked," Cobalt Partners, 944 N.Y.S.2d at 33, because -- even though CK41 became a subsidiary of Galaxy in April of 2010 -- plaintiff is not claiming any breach of the CK41 Agreement after Galaxy's formation. Moreover, that document ostensibly [*20] ceased being the operative contract when the Galaxy Agreement was entered into. Thus, to the extent plaintiff is seeking to hold the JT Defendants liable for breach of the CK41 Agreement, those claims are dismissed.

### B. The Corporate Veil May Not Be Pierced for Purposes of the Galaxy Agreement as to the Fund and the Group

The Fund and the Group argue that all measures they took to affect Galaxy's business were intended only to protect their investment interest and pursuant to their rights as lenders and as shareholders. They contend that the complaint alleges only that they effected changes in management and the board of directors (Compl. ¶¶ 47-51, 54), made expenditures (id. ¶¶ 53, 55-58), and attempted to secure take-out financing (id. ¶¶ 59-63), none of which is outside the scope of their rights.

The Fund and the Group compare their actions to those at issue in Coppola v. Bear Stearns & Co., 499 F.3d 144, 150-51 (2d Cir. 2007), where the Second Circuit found that a lender was not liable as an employer under the Worker Adjustment and Retraining Notification Act ("WARN"), 29 U.S.C. §§ 2101-09, because it did not "exercis[e] control over the debtor beyond that necessary to recoup some [*21] or all of what is owed." For purposes of lender liability under WARN, the court held that "a creditor may exercise very substantial control in an effort to stabilize a debtor and/or seek a buyer so as to recover some or all of its loan or security." Coppola, 499 F.3d at 150. It noted that, under "traditional principles of lender liability," a creditor ought to be able to "assume[] control of the borrower's business . . . as a means to protect its security for repayment," though not operate it "as a going concern." Id. at 148-49. In short, the court was emphasizing that traditional methods of assigning liability have little relevance to lenders who have put money into a company.

While Coppola is limited to the WARN context and therefore does not control our decision here, it is nevertheless instructive. As the Second Circuit recognized, HN7[↑] lenders must be able to exercise a meaningful degree of control over their borrowers when their interest is at stake without fear of being held liable for obligations incurred by the borrower. A contrary result would disincentivize lending to all but the least risky of ventures and would, quite simply, be unfair to lenders. Cf. Morris, 82 N.Y.2d at 140-41 [*22] (noting that veil-piercing should be employed "to achieve equity" and "depend[s] on the attendant facts and equities" (internal quotation marks omitted)); E. Hampton Union Free Sch. Dist. v. Sandpebble Builders, Inc., 935 N.Y.S.2d 144, 145, 90 A.D.3d 820, 820 (N.Y. App. Div. 2d Dep't 2011) (veil-piercing is appropriate only when the company has "abused the privilege of doing business in the corporate form" (internal quotation marks omitted)).

With that context in mind, we cannot conclude that plaintiff has adequately alleged that the Fund and the Group dominated Galaxy. Plaintiff has alleged only the following nonconclusory facts about the Fund and the Group pertinent to the question of domination: Galaxy is undercapitalized and dependent upon the JT Defendants[13] for financial support, which circumstance

---

[13] A number of plaintiff's allegations do not differentiate

2012 U.S. Dist. LEXIS 93944, *22

was caused, at least in part, by a bridge loan from the Fund (id. ¶¶ 52, 57); the Fund paid Galaxy's vendors directly, though it required bridge loan agreements from Galaxy for those payments (id. ¶ 58); the Fund was responsible for paying, and did pay for some period of time, the premiums on Galaxy's D&O insurance (Compl. ¶¶ 35-38, 53); the JT Defendants would decide how to allocate [*23] money they provided to Galaxy (id. ¶ 53); the JT Defendants appointed Plumb as CFO (id. ¶ 48); the JT Defendants had individuals elected to Galaxy's board who were controlled by Belesis, the CEO of JTF (id. ¶ 51); and the JT Defendants, apparently predominantly or solely through Belesis, met with current and potential Galaxy investors (id. ¶¶ 58-63).[14]

These allegations touch on certain of the factors outlined by the Second Circuit as relevant to a determination of domination. Plaintiff alleges lack of corporate formalities and the assumption of debts, to the extent the Fund paid Galaxy's vendors directly from loaned funds, as well as inadequate capitalization. The Fund's requiring bridge loan agreements for the payments to vendors, however, indicates that it continued to deal at arm's length with Galaxy. Moreover, plaintiff has also specifically alleged the maintenance of

a number of other corporate formalities, including the [*25] issuance of stock and election of directors. And HN10[↑] inadequate capitalization is fairly meaningless in a non-parent/subsidiary relationship. Cf. Coppola, 499 F.3d at 150 (noting that a number of "standard 'piercing the veil' factors to be used in the case of related firms . . . have little direct bearing on paradigmatic relationships between lenders and borrowers").

The remaining allegations pertain only to Galaxy's business discretion being circumscribed by its lenders. These allegations fail to differentiate between the JT Defendants and frequently reference Belesis's actions rather than those of Jarkesy, the managing member of the Group, and are thus prima facie suspect. The allegations, moreover, also pertain precisely to the type of conduct implicated in Coppola; that the JT Defendants ensured the money they lent to Galaxy was used as they saw fit is to be expected of a lender. Regardless, the allegations are too thin to overcome the law's reluctance to discard the corporate form, cf. Cobalt Partners, 944 N.Y.S.2d at 33, and they are particularly insufficient because they relate only to actions expected of shareholders and creditors.

Because he cannot pierce the corporate veil to reach [*26] the Fund and the Group, plaintiff's breach of contract claim against those defendants is dismissed.

**C. The Corporate Veil May Not Be Pierced for Purposes of the Galaxy Agreement as to JTF**

Plaintiff's allegations pertaining to JTF's domination of Galaxy are largely the same as those leveled against the Fund and the Group, less the allegations of payments to Galaxy's creditors. Plaintiff also adds, however, that Belesis promised that JTF would pay plaintiff the money he was owed under his employment agreements (Compl. ¶ 41) and that Belesis retained his personal lawyer to represent Galaxy in its investigation by the SEC (id. ¶ 65).[15]

As with the other JT Defendants, these allegations are too weak to warrant disregarding corporate entities' presumed separateness. That a lender would determine how money borrowed by a debtor is spent is not

---

between the three JT Defendants. Given the presumption of separateness between corporate entities, see Morris, 82 N.Y.2d at 140, plaintiff must demonstrate why his declining to distinguish between them is appropriate. (The Fund and the Group do not object to their treatment as a single entity, and we therefore question only the lack of differentiation between those two entities and JTF.) Plaintiff has, however, only alleged in a conclusory fashion that Belesis had the power to direct the Fund's use of money and that JTF controlled the other JT Defendants. (Compl. ¶¶ 16, 57, 44.) These allegations are far from sufficient to warrant treating the JT Defendants as one entity. Plaintiff's failure to differentiate between them thus severely hampers his veil-piercing argument. Cf. Cenage Learning, Inc. v. Buckeye Books, 531 F. Supp. 2d 596, 599 (S.D.N.Y. 2008) [*24] (HN8[↑] "Lumping all the 'defendants' together for purposes of alleging [personal jurisdiction] is . . . patently insufficient.").

[14] Plaintiff has also alleged that the Fund holds 43.18% of Galaxy's stock (Compl. ¶ 45), but HN9[↑] even "complete ownership of a subsidiary's stock is insufficient, by itself, to pierce the corporate veil" because "'[a]ctual domination, rather than the opportunity to exercise control, must be shown.'" Oppenheimer & Co. v. Deutsche Bank AG, No. 09 Civ. 8154, 2010 U.S. Dist. LEXIS 19655, at *11-12 (S.D.N.Y. Mar. 2, 2010) (quoting De Jesus v. Sears, Roebuck & Co., 87 F.3d 65, 69 (2d Cir. 1996)).

[15] Belesis is also alleged to own two million shares in Galaxy through a holding company, which, as noted above, has minimal impact on our analysis. See Oppenheimer, 2010 U.S. Dist. LEXIS 19655, at *11-12.

Page 10 of 13

2012 U.S. Dist. LEXIS 93944, *26

unusual in the ordinary course of such a relationship, and the installation of a CFO and other negotiations with management are not unexpected extensions [*27] of that power. Likewise, when an entity has been engaged to secure financing, there is nothing suspect about it meeting with investors or telling those investors that it was "responsible for funding Galaxy and for raising monies from potential investors." (Id. ¶ 63.)

The remaining allegations regarding JTF are stronger, though they are still insufficient for plaintiff's purposes. While the allegation that one of the directors elected in January 2011 was Belesis's uncle may be sufficient to support an inference of control over that director, cf. Ellison v. Am. Image Motor Co., 36 F. Supp. 2d 628, 638 (S.D.N.Y. 1999) (noting that, for purposes of the Exchange Act, "family relationships" may be sufficient to demonstrate control over others), there are no similar or non-conclusory allegations regarding the other directors. Cf. Strugala v. Riggio, 817 F. Supp. 2d 378, 387-88 (S.D.N.Y. 2011) (noting that, for purposes of demand futility, Delaware's presumption of independence of directors is not necessarily overcome by business and personal relationships). Regardless, even if Belesis did have the ability to control the board, there are no allegations that he used that control to improperly [*28] dominate the corporation. Cf. De Jesus v. Sears, Roebuck & Co., 87 F.3d 65, 69 (2d Cir. 1996) (HN11[↑]) requiring "[a]ctual domination, rather than the opportunity to exercise control"). The allegation that Belesis hired his personal attorney to represent Galaxy goes to an overlap in personnel, but the acknowledgement that Schuster recognized the potential conflict of interest and withdrew his representation of Galaxy militates strongly against an inference of domination.

Plaintiff has thus failed to sufficiently allege that JTF dominated Galaxy and thereby justify piercing the corporate veil. The breach of contract claim against JTF is dismissed.[16]

### III. Tortious Interference with Contract

### A. The Law of Tortious Interference with Contract

HN12[↑] There are five elements to a claim of tortious interference with an existing contract under New York law:[17] "the plaintiff must show [1] the existence of its valid contract with a third [*29] party, [2] defendant's knowledge of that contract, [3] defendant's intentional and improper procuring of [4] a breach, and [5] damages." White Plains Coat & Apron Co. v. Cintas Corp., 8 N.Y.3d 422, 426, 867 N.E.2d 381, 835 N.Y.S.2d 530 (2007); see also Sokol Holdings, Inc. v. BMB Munai, Inc., 726 F. Supp. 2d 291, 304 (S.D.N.Y. 2010). The test requires that the breach of the contract would not have occurred "but for" the defendant's conduct. E.g., Sun Gold, Corp. v. Stillman, No. 7702-401609/08, 95 A.D.3d 668, 946 N.Y.S.2d 24, 2012 N.Y. App. Div. LEXIS 3902, at *2-3 (N.Y. App. Div. 1st Dep't May 22, 2012) (citing Lana & Samer, Inc. v. Goldfine, 776 N.Y.S.2d 66, 67, 7 A.D.3d 300, 301 (N.Y. App. Div. 1st Dep't 2004)); Ferrandino & Son, Inc. v. Wheaton Builders, Inc., 920 N.Y.S.2d 123, 125, 82 A.D.3d 1035, 1036 (N.Y. App. Div. 2d Dep't 2011); Montano v. City of Watervliet, 850 N.Y.S.2d 273, 277, 47 A.D.3d 1106, 1110 (N.Y. App. Div. 3d Dep't 2008); Kan. State Bank of Manhattan v. Harrisville Volunteer Fire Dep't, Inc., 886 N.Y.S.2d 278, 279, 66 A.D.3d 1409, 1411 (N.Y. App. Div. 4th Dep't 2009).

A defendant may assert in response to this claim the economic interest affirmative defense -- "that it acted to protect its own legal or financial stake in the breaching party's business" -- which has been applied, as the New York Court of Appeals has noted, in situations "where defendants were significant stockholders in the breaching party's business" and "where defendant was the breaching party's creditor." White Plains Coat & Apron, 8 N.Y.3d at 426 (citing, inter alia, Felsen v. Sol Cafe Mfg. Corp., 24 N.Y.2d 682, 687, 249 N.E.2d 459, 301 N.Y.S.2d 610 (1969); Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A., 579 N.Y.S.2d 353, 354, 179 A.D.2d 592, 592-93 (N.Y. App. Div. 1st Dep't 1992)). The defense will not lie if there has been "a showing of malice or illegality." Foster v. Churchill, 87 N.Y.2d 744, 750, 665 N.E.2d 153, 642 N.Y.S.2d 583 (1996); see also Wilmington Trust Co. v. Burger King

---

[16] Plaintiff's claim that the JT Defendants violated Sections 193 and 198 of the New York Labor Law is dependent on his veil-piercing allegations. (Compl. ¶ 104.) Because those allegations are inadequate, the Labor Law claim is also dismissed as against all of the JT Defendants.

[17] Rather than perform a choice-of-law analysis, we defer to the parties' chosen law. See Kwan v. Schlein, 441 F. Supp. 2d 491, 500-01 (S.D.N.Y. 2006) (citing 3Com Corp. v. Banco do Brasil, S.A., 171 F.3d 739, 743 (2d Cir. 1999)) [*30] .

2012 U.S. Dist. LEXIS 93944, *30

Corp., 826 N.Y.S.2d 205, 206, 34 A.D.3d 401, 402 (N.Y. App. Div. 1st Dep't 2006); Hirsch v. Food Res., Inc., 808 N.Y.S.2d 618, 622, 24 A.D.3d 293, 296-97 (N.Y. App. Div. 1st Dep't 2005).

### B. Plaintiff Has Not Adequately Alleged That the JT Defendants Tortiously Interfered with Either Contract

Plaintiff [*31] argues that his contracts were breached in three ways: (1) he was not paid his salary or other benefits, (2) his D&O insurance was allowed to lapse after his resignation, and (3) his responsibilities were diminished from how they were described in the contract.[18]

As an initial matter, as discussed above, the complaint contains no allegations pertinent to the JT Defendants while the CK41 Agreement was operative. Indeed, the only relevant allegation at all is that the JT Defendants performed part of the contract by paying the premiums on plaintiff's D&O insurance. Accordingly, the JT Defendants could not have interfered with CK41's performance of that contract.

The substance of plaintiff's allegations pertains solely to the Galaxy Agreement. [*32] With respect to the claims that Galaxy failed to pay plaintiff or otherwise spend money on his behalf, plaintiff has failed to allege an adequate degree of causation. He has not alleged that, in the absence of the JT Defendants' influence, Galaxy would have paid him or provided his benefits and insurance. There are, in fact, no non-conclusory allegations at all regarding whether the JT Defendants exercised any control over these types of payments prior to Plumb's appointment in October 2010. The most relevant allegation thereafter is that, "[a]t the direction of the [JT] Defendants, Mr. Plumb refused to pay Mr. Savage's payroll taxes and withholdings on his salary, or any of the other monies Mr. Savage was due under the Employment Agreement." (Compl. ¶ 55.) Plaintiff does not, however, allege that Galaxy even would have had the funds to pay him, let alone would have actually paid him, absent the JT Defendants' interference. Given that plaintiff alleges that Galaxy had already failed to pay his salary prior to October 2010, his claim must fail on causation grounds. See RSM Prod. Corp. v. Fridman, 643 F. Supp. 2d 382, 410 (S.D.N.Y. 2009) (holding that HN13[↑] a company's "predispos[ition] toward [*33] breaching the contract even in the absence of the alleged interference" precludes a finding of causation).

Moreover, plaintiff even concedes that Galaxy was simply unable to pay him, alleging that "Galaxy is wholly undercapitalized [and] incapable of independently meeting its financial obligations," citing as evidence JTF's promise "at the time that Galaxy was formed" to raise $1.3 million in equity. (Id. ¶¶ 52, 15.) Likewise, with respect to the D&O insurance, plaintiff alleges only that the Fund "refused to pay the $1,278 in fees to maintain coverage" (id. ¶ 37), not that Galaxy had the funds and was prevented from using them to maintain the insurance by the JT Defendants. Plaintiff has thus failed to allege causation with respect to these purported breaches.[19]

Plaintiff's allegations with respect to the diminution of his responsibilities run into their own troubles with respect to the breach element. Under the agreements, plaintiff's positions are described as having "primary responsibility for the business of the Company, including all activities related to the promotion, advertising, sale and marketing of the Company's products and all creative, packaging, and product fulfillment activities of the Company." (Compl. ¶ 17.) Contrary to plaintiff's assertion (id. ¶ 54), this description does not confer upon plaintiff the power to unilaterally direct Galaxy's finances. Rather, it suggests that plaintiff's role was envisioned as being related to the development, launch, and promotion of products -- as would be appropriate given plaintiff's self-professed "expert[ise] in the fields of marketing and branding" and the agreed-upon bonuses pegged to

---

[18] Although plaintiff mentioned the diminution of his responsibilities in his resignation letter, he does not claim it as a breach of contract in the complaint. (Compl. ¶¶ 76-82.) Nor does he claim breach from the failure to pay the premiums on his D&O insurance. Rather, he claims only breach stemming from Galaxy's failure to pay him or provide his benefits. We address plaintiff's insurance and responsibilities only in the interests of thoroughness.

[19] Plaintiff's argument about his responsibilities is also weak on causation. Because plaintiff only contends that his powers were indirectly diminished as a result of the newly appointed CFO performing certain of his responsibilities, not through any sort of direct changes to the company's bylaws, for example, his argument rests on the assumption that Galaxy would not have appointed any CFO if not for the JT Defendants. For [*34] a company conducting business on the scale of Galaxy, such a significant assumption is hardly plausible. Cf. Iqbal, 556 U.S. at 678.

2012 U.S. Dist. LEXIS 93944, *34

product launches and gross revenues rather than profits (id. ¶¶ 5, 19, 20) -- not the fiscal matters that are typically the purview of a CFO. Indeed, precisely how Plumb's [*35] appointment "effectively stripped" plaintiff of his powers (id. ¶ 42) is nowhere articulated in the complaint.[20] Cf. Antonios A. Alevizopoulos & Assocs., Inc. v. Comcast Int'l Holdings, Inc., 100 F. Supp. 2d 178, 186 (S.D.N.Y. 2000) (requiring HN14[↑] "some factual specificity in pleading tortious interference" (citing De Jesus, 87 F.3d at 70)). These allegations do not rise to the requisite level of plausibility.

### C. The JT Defendants Are Protected by the Economic Interest Defense

Even had plaintiff adequately alleged tortious interference, he has also alleged that the JT Defendants had an economic interest in Galaxy. Plaintiff specifically referenced the significant shareholdings of the Fund and JTF -- the former with a larger percentage than any other shareholder -- which give them an obvious economic interest in Galaxy's performance and therefore in its CEO's employment. See, e.g., Felsen, 24 N.Y.2d at 687 [*36] (noting the applicability of the defense to "a person who has a financial interest, as a stockholder, in the business of another"); Hirsch, 808 N.Y.S.2d at 622, 24 A.D.3d at 296-97; Imtrac Indus., Inc. v. Glassexport Co., No. 90 Civ. 6058, 1996 U.S. Dist. LEXIS 1022, at *23 (S.D.N.Y. Feb. 1, 1996). As lenders to Galaxy, the JT Defendants have yet further grounds -- stemming from an interest in collecting on their debt -- to assert the defense. See, e.g., Wilmington Trust, 826 N.Y.S.2d at 206, 34 A.D.3d at 402; Ultramar, 579 N.Y.S.2d at 354, 179 A.D.2d at 592-93; Pan Am Corp. v. Delta Air Lines, Inc., 175 B.R. 438, 515-16 (S.D.N.Y. 1994).

Plaintiff does not attempt to defeat the economic interest defense by alleging that the JT Defendants acted with malice or in any way that was illegal. Rather, he argues that, because it is an affirmative defense, the economic interest defense ought not to be considered on a motion to dismiss. See, e.g., U.S. Fidelity & Guar. Co. v. Petroleo Brasileiro S.A.-Petrobras, No. 98 Civ. 3099, 2001 U.S. Dist. LEXIS 3349, at *81 (S.D.N.Y. Mar. 27, 2001) (noting that, because the court could not determine on a motion to dismiss whether the defendant had an economic [*37] justification for its conduct, the tortious interference claim could not be dismissed). However, HN15[↑] affirmative defenses may be considered on motions to dismiss if they "appear[] on the face of the complaint." Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 74 (2d Cir. 1998).

In this case, plaintiff has specifically alleged the JT Defendants' economic interests in Galaxy as stockholders and lenders, and he has not alleged any sort of improper motive, let alone one rising to the level required to overcome the defense. Cf. Steiner Sports Mktg., Inc. v. Weinreb, 930 N.Y.S.2d 186, 187, 88 A.D.3d 482, 483 (N.Y. App. Div. 1st Dep't 2011) (affirming dismissal of tortious interference counterclaim on a motion to dismiss because of "the factual allegations demonstrating that [plaintiff] had a normal economic interest in interfering").

Plaintiff has thus both failed to allege the elements of tortious interference with contract and alleged an affirmative defense to the tort, and the claim is therefore dismissed.

### CONCLUSION

For the foregoing reasons, the JT Defendants' motions (docket nos. 17, 19) are grant

Dated: New York, New York

July 5, 2012

/s/ Naomi Reice Buchwald

NAOMI REICE BUCHWALD

UNITED STATES [*38] DISTRICT JUDGE

---

End of Document

---

[20] We note also that, even if plaintiff had sufficiently alleged that he had lost his contracted-for responsibility, he has made no showing of what the damages from such a breach would be, particularly in light of the fact that Galaxy had already stopped paying him by the time of Plumb's appointment.