# EXHIBIT H



Positive
As of: December 8, 2023 8:56 PM Z

# Anders v. Verizon Communs. Inc.

United States District Court for the Southern District of New York

June 5, 2018, Decided; June 5, 2018, Filed

16-CV-5654 (VSB)

**Reporter**
2018 U.S. Dist. LEXIS 95303 *; 2018 WL 2727883

REGGIE ANDERS and UNDERDOG TRUCKING, LLC, Plaintiffs, - against - VERIZON COMMUNICATIONS INC., CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS, NATIONAL ACTION NETWORK, REVEREND AL SHARPTON, and John Does 1-9, Defendants.

**Subsequent History:** Reconsideration denied by Anders v. Verizon Communs., Inc., 2018 U.S. Dist. LEXIS 212108 (S.D.N.Y., Dec. 17, 2018)

**Prior History:** Underdog Trucking, LLC v. Verizon Servs. Corp., 2010 U.S. Dist. LEXIS 72642 (S.D.N.Y., July 20, 2010)

## Core Terms

motion to dismiss, courts, third amended complaint, personal jurisdiction, terms, subject matter jurisdiction, tortious interference, district court, contacted, amend, breach of contract, public policy, pre-motion, pleadings, second amended complaint, amended complaint, cause of action, oral agreement, contracts, meetings, damages

**Counsel:** [*1] For Plaintiffs: Japheth Nthautha Matemu, Law Offices of Japheth N. Matemu, New York, New York.

For Verizon Communications Inc. and Cellco Partnership, Defendants: Raymond G. McGuire, Kristina Cunard Hammond, Kauff McGuire & Margolis LLP, New York, New York; Philip R. Sellinger, Todd Lawrence Schleifstein, New York, New York.

For National Action Network and Reverend Al Sharpton, Defendants: David Allen Thompson, Wylie M. Stecklow, Stecklow Cohen & Thompson, New York, New York.

**Judges:** Vernon S. Broderick, United States District Judge.

**Opinion by:** Vernon S. Broderick

## Opinion

## OPINION & ORDER

VERNON S. BRODERICK, United States District Judge:

Plaintiffs Reggie Anders and Underdog Trucking, LLC ("Underdog," and together with Anders, "Plaintiffs") bring the instant action against Defendants Verizon Communications Inc. ("VCI"), Cellco Partnership d/b/a Verizon Wireless ("Verizon Wireless," and together with VCI, the "Verizon Defendants"), National Action Network ("NAN"), Reverend Al Sharpton ("Sharpton," and together with NAN, the "NAN Defendants"), and nine John Does asserting state law claims for breach of contract and tortious interference pursuant to 28 U.S.C. § 1332.

Before me are motions to dismiss filed by the NAN Defendants and Verizon [*2] Defendants. The NAN Defendants move to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(2), 12(b)(5), and 12(b)(6), and the Verizon Defendants move to dismiss pursuant to Rules 12(b)(1) and 12(b)(6). Because I find that Plaintiffs have failed to set forth a plausible claim for breach of contract under New York law, both motions to dismiss are GRANTED under Federal Rule of Civil Procedure 12(b)(6).

## I. Background[1]

---

[1] The following factual summary is drawn from the allegations of Plaintiff's third amended complaint, filed March 6, 2017, (Doc. 81), which I assume to be true for purposes of this motion. See *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). My references to these allegations should not be construed as a finding as to their veracity, and I

2018 U.S. Dist. LEXIS 95303, *2

Anders, the owner of Underdog, a shipping company doing business in Louisiana, and Verizon Wireless, a telecommunications and wireless service provider, had a "long standing dispute" that resulted in several prior lawsuits that have now been dismissed. (TAC ¶¶ 4, 7; see also Underdog Trucking, L.L.C v. Cellco P'ship, No. 10 Civ. 9189(DLC), 2012 U.S. Dist. LEXIS 89415, 2012 WL 2422040 (S.D.N.Y. June 26, 2012), aff'd, 514 F. App'x 31 (2d Cir. 2013); Anders v. Verizon Servs. Corp., No. 09 Civ.8919(DLC), 2011 U.S. Dist. LEXIS 133413, 2011 WL 5837239 (S.D.N.Y. Nov. 18, 2011).)[2] The previously-dismissed actions arise out of the same underlying facts—that the Verizon Defendants and Underdog entered into a contract in which Underdog would provide trucking services to the Verizon Defendants, Underdog provided these services between 2007 and 2009, and beginning in 2009 the Verizon Defendants gave Underdog less work than in 2007 and 2008. See Underdog Trucking, 2012 U.S. Dist. LEXIS 89415, 2012 WL 2422040, at *1-2; Anders, 2011 U.S. Dist. LEXIS 133413, 2011 WL 5837239, at *1. In the previous suits, Plaintiffs brought claims against the Verizon Defendants for breach of contract and racial discrimination. See Underdog Trucking, 2012 U.S. Dist. LEXIS 89415, 2012 WL 2422040, at *1; Anders, 2011 U.S. Dist. LEXIS 133413, 2011 WL 5837239, at *1. Both actions were dismissed at the summary judgment stage: the first on November [*3] 18, 2011, and the second on June 26, 2012.

Despite the dismissal, in 2013, after conferring with his reverend David Wade and Wade's attorney Benjamin Taylor, Anders sent the Verizon Defendants a demand letter stating that if the dispute did not get resolved "the community of Reverends would call for a boycott against Verizon with Reverend Al Sharpton leading the charge." (TAC ¶¶ 8-9.) The Verizon Defendants' attorneys, Raymond McGuire and Kristina Hammond, contacted Taylor and requested one week to discuss this letter with the Verizon Defendants before Anders or

---

[2] "TAC" refers to Plaintiff's third amended complaint, filed March 6, 2017. (Doc. 81.) Although I do not make any determination as to the truth of the matters asserted in the prior cases, I take judicial notice of the proceedings and any documents filed in the course of these proceedings. See Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991) ("[C]ourts routinely take judicial notice of documents filed in other courts, again not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.").

the reverends took any action. (Id. ¶ 10.)

When Taylor did not hear from the Verizon Defendants, McGuire, or Hammond for several weeks, "Anders and the group of Reverends then proceeded to organize against Verizon and get Al Sharpton and other Civil Rights Activists on board." (Id. ¶ 11.) In July 2014 Wade contacted the Chairman of the NAN, Franklyn Richardson, regarding the conflict between Underdog and the Verizon Defendants. (Id. ¶ 13.) Richardson told Wade that Sharpton handled "this kind of situation" all the time. (Id. ¶ 14.) Richardson discussed the conflict with Sharpton and told Wade that Sharpton would "take the [*4] case" for $16,000. (Id. ¶ 15.) Richardson said that "in exchange for the payment of $16,000, Al Sharpton and NAN would ensure that Al Sharpton would do everything in his power to seek justice for the plaintiffs by doing whatever was necessary to rectify the injustice done by Verizon," specifically through the use of television shows and press conferences. (Id. ¶ 16.)

On August 28, 2014, Anders and Wade met with Richardson and Sharpton at NAN headquarters in New York. (Id. ¶ 18.) Anders handed Wade $16,000, and Wade handed the money to Richardson and Sharpton. (Id.) After the exchange of money, Anders, Wade, Sharpton, Richardson, and Michael Hardy, Sharpton and NAN's attorney, had a forty-five minute discussion regarding "what Al Sharpton would do." (Id. ¶ 19.) During that discussion, Sharpton told Anders he would arrange a meeting with Verizon's CEO and "address the issues regarding [Anders's] treatment by Verizon," and that if the meeting did not work, that he would "make a lot of noise via his media programs exposing them for discriminatory and racists [sic] practices" against Anders. (Id. ¶ 20.)

When Anders and Wade did not hear from Sharpton for approximately four to six weeks, they [*5] contacted Richardson, who told them that Sharpton and the Vice President of Verizon were scheduled to meet later that week. (Id. ¶ 21.) The next week, Anders contacted Hardy, who told Anders that he did not have any details about the meeting but that he would keep Anders informed when he received more information. (Id. ¶ 22.) After several months of waiting, Anders again called the NAN and Hardy, but they continued to "giv[e] different stories" and would not provide anything "concrete"— "Hardy would name alleged meetings, but gave no details as to who Al Sharpton met with or what they discussed." (Id. ¶¶ 23-24.) Anders started getting suspicious because "he felt something was not adding

2018 U.S. Dist. LEXIS 95303, *5

up" and "[t]he character, urgency [and] motivation on the part of . . . Sharpton and NAN officials had suddenly disappeared and there was a sudden disinterest." (*Id.* ¶ 25.)

On January 4, 2015, the New York Post published an article which suggested that "several large corporations including Verizon had given . . . Sharpton over $1 million for his birthday." (*Id.* ¶ 26.) Anders made "some inquiries" after this article was published, and learned from his sources that Sharpton and NAN had received payments [*6] from the Verizon Defendants "that could not be explained and which seemed to coincide with the sudden disinterest in the subject of the agreement on the part of NAN and . . . Sharpton." (*Id.* ¶ 27.) Anders believes that this money was "hush money," and claims that if he had known that Sharpton was working with Verizon he would not have gotten Sharpton involved. (*Id.* ¶¶ 12, 26.)

When Anders learned of these payments, he called McGuire to both "let him know he felt that Verizon was in cahoots with . . . Sharpton" and to alert McGuire to the New York Post article. (*Id.* ¶ 28.) McGuire started reading the article out loud over the phone, and said "this doesn't look good." (*Id.*) He told Anders that he would speak to his client and be back in touch with Anders. (*Id.*) McGuire never got back in touch with Anders. (*Id.*)

Anders then directly confronted Sharpton regarding the New York Post article. (*Id.* ¶ 31.) When he did so, Sharpton began insulting Anders, calling him and Wade "punks" for believing the New York Post article "because people write about him all the time." (*Id.* ¶ 32.) Wade and Sharpton also "got into a heated argument because of the insults . . . Sharpton was hurling." (*Id.* ¶ 33.) [*7] After Wade and Sharpton stopped arguing, Sharpton "assured [Anders and Wade] that he would do whatever was necessary" to get Verizon to provide relief to Anders. (*Id.*) Sharpton then told Anders to call NAN once a week for updates, but when Anders did so he got "the runaround." (*Id.* ¶ 34.) Although Anders was repeatedly told that Sharpton and NAN were scheduling meetings with Verizon, Anders did not know whether these meetings were actually occurring, nor did he perceive any changes in his situation. (*See id.* ¶ 35.) Although Anders saw one email stating that Verizon's procurement group had assigned a representative to settle the problem, there were no other signs of progress even though Sharpton made repeated statements as if progress was being made. (*See id.* ¶¶ 36-37.) During one conversation with Richardson, Anders and Wade said "they had been strung along for years and that nothing had transpired." (*Id.* ¶ 38.) Richardson proposed that he would pay Anders back the $16,000, but Anders "decided to sue Al Sharpton because of his conflict of interest and the much greater losses than just the $16,000." (*Id.* ¶ 39.)

II. Procedural History

Plaintiffs commenced the instant action by filing their [*8] Complaint on July 15, 2016.[3] They filed their first amended complaint ("First Amended Complaint") on July 27, 2016. (Doc. 4.) On October 31, 2016, the NAN Defendants filed a letter-motion requesting a pre-motion conference in anticipation of filing a motion to dismiss. (Docs. 23, 24.) After receiving letters requesting a pre-motion conference, (Docs. 23, 24, 37),[4] I held a pre-motion conference regarding the NAN and Verizon Defendants' anticipated motions to dismiss on December 8, 2016, (*see* Dkt. Entry Dec. 8, 2016). At that conference, I granted Plaintiffs leave to file a second amended complaint on or before January 9, 2017. (*See* Doc. 59, at 1.)

Plaintiffs made two deficient attempts to file a second amended complaint on January 9, 2017, but correctly filed their second amended complaint on January 13, 2017 (the "Second Amended Complaint").[5] On January 26, 2017, the NAN Defendants filed a letter motion requesting a pre-motion conference for their anticipated motion to dismiss the Second Amended Complaint. (Doc. 61.) The Verizon Defendants also filed a second letter-motion requesting a pre-motion conference on January 27, 2017. (Docs. 63, 64.) Plaintiffs simultaneously requested leave [*9] to file a third amended complaint. (Doc. 72.)

On March 6, 2017, Plaintiffs filed their third amended complaint (the "Third Amended Complaint"). (Doc. 81.)

---

[3] The initial Complaint was deficiently filed, but the deficiency was corrected through Plaintiffs' filing of their first amended complaint.

[4] The NAN Defendants' letter-motion appears twice on the docket. (Docs. 23, 24.)

[5] On January 18, 2017, I issued an Order deeming Plaintiff's January 13, 2017 submission timely filed in light of Plaintiff's good faith efforts to timely file a second amended complaint. (Doc. 59.)

2018 U.S. Dist. LEXIS 95303, *9

Subsequently, on April 5, 2017, the NAN Defendants filed their motion to dismiss, memorandum of law, and affirmation in support of their motion. (Docs. 85, 87-88.) On April 6, 2017, the Verizon Defendants filed their motion to dismiss and memorandum of law. (Docs. 89-90.) Plaintiffs filed their opposition to the NAN Defendants' motion to dismiss, along with three affidavits in opposition, on April 21, 2017. (Docs. 94-98.) Plaintiffs filed their opposition to the Verizon Defendants' motion to dismiss, as well as an affidavit in opposition, on the same day. (Docs. 99-100.) Both the NAN Defendants and the Verizon Defendants filed their respective replies on May 11, 2017. (Docs. 105-06.)

### III. Legal Standards

#### A. Rule 12(b)(1)

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000); see also Fed. R. Civ. P. 12(b)(1). If challenged, a plaintiff is required to show that subject matter jurisdiction exists by a preponderance of the evidence, id., and in analyzing such a challenge [*10] "the district court must take all uncontroverted facts in the complaint . . . as true, and draw reasonable inferences in favor of the party asserting jurisdiction," Tandon v. Captain's Cove Marina of Bridgeport, Inc., 752 F.3d 239, 243 (2d Cir. 2014). However, "jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." Morrison v. Nat'l Australia Bank Ltd., 547 F.3d 167, 170 (2d Cir. 2008) (quoting APWU v. Potter, 343 F.3d 619, 623 (2d Cir. 2003)). Furthermore, in resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court "has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits." Tandon, 752 F.3d at 243 (quoting APWU, 343 F.3d at 627); see also Makarova, 201 F.3d at 113.

Federal courts have original jurisdiction over state law claims pursuant to 28 U.S.C. § 1332(a) where a dispute is between citizens of different states and the amount in controversy exceeds $75,000. See 28 U.S.C. § 1332(a). Where a claim is brought pursuant to § 1332 and the defendant challenges the factual basis for jurisdiction— i.e., the amount in controversy—the party invoking jurisdiction bears the burden of proving there is a "reasonable probability that the claim is in excess of the statutory jurisdictional amount." Jordan v. Verizon Corp., No. 08 Civ. 6414(GEL), 2009 U.S. Dist. LEXIS 44798, 2009 WL 1490813, at *2 (S.D.N.Y. May 27, 2009) (quoting Tongkook Am., Inc. v. Shipton Sportswear Co., 14 F.3d 781, 784 (2d Cir. 1994)), aff'd, 391 F. App'x 10 (2d. Cir. 2010); see also Scherer v. Equitable Life Assurance Soc'y of U.S., 347 F.3d 394, 397 (2d Cir. 2003).

The burden of proving jurisdiction is "hardly onerous"—there is a "rebuttable presumption [*11] that the face of the complaint is a good faith representation of the actual amount in controversy." Scherer, 347 F.3d at 397 (quoting Wolde-Meskel v. Vocational Instruction Project Cmty. Servs., Inc., 166 F.3d 59, 63 (2d Cir. 1999)). In order to rebut this presumption, the party opposing jurisdiction must prove that it is a "'legal certainty' that the amount recoverable does not meet the jurisdictional threshold." Id. (quoting Wolde-Meskel, 166 F.3d at 63). "If any of the grounds for subject matter jurisdiction are lacking, dismissal is mandatory." Gunst v. Seaga, No. 05 Civ. 2626 DAB, 2007 U.S. Dist. LEXIS 25257, 2007 WL 1032265, at *2 (S.D.N.Y. Mar. 30, 2007); see also United Food & Commercial Workers Union, Local 919, AFL-CIO v. Centermark Props. Meriden Square, Inc., 30 F.3d 298, 301 (2d Cir. 1994).

"[B]are statement[s]" that the jurisdictional amount has been met "provides no assurance that this estimate is made in good faith" and thus cannot confer jurisdiction. Kimm v. KCC Trading, Inc., 449 F. App'x 85, 85-86 (2d Cir. 2012) (summary order) (affirming dismissal for lack of subject matter jurisdiction where the plaintiff only "alleged generally that th[e] action involved an amount in controversy exceeding $75,000"). "A plaintiff's mere mention of an amount greater than $75,000 is not a magic talisman that wards off a district court's inquiry into the actual amount at issue." Bernshteyn v. Feldman, No. 04 Civ. 1774(GEL), 2006 U.S. Dist. LEXIS 62689, 2006 WL 2516514, at *2 (S.D.N.Y. Aug. 29, 2006). However, "[u]sing boilerplate language that the amount of controversy exceeds $75,000 does not necessarily render the alleged damages conclusory." Geffner v. Iona Coll., No. 13 Civ. 1156(DAB), 2013 U.S. Dist. LEXIS 144850, 2013 WL 5549922, at *4 (S.D.N.Y. Oct. 2, 2013). "When the asserted amount [*12] in controversy is based on a cause of action created by state law, 'the federal courts must . . . look to state law to determine the nature and extent of the right to be

enforced.'" *Bernshteyn*, 2006 U.S. Dist. LEXIS 62689, 2006 WL 2516514, at *2 (quoting *Horton v. Liberty Mut. Ins. Co.*, 367 U.S. 348, 352-53, 81 S. Ct. 1570, 6 L. Ed. 2d 890 (1961)).

## B. Rule 12(b)(2)

When a defendant moves for dismissal for lack of personal jurisdiction pursuant to Rule 12(b)(2), the plaintiff bears the burden of demonstrating that the court has jurisdiction over the defendant. *Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 240 (2d Cir. 1999). In considering motions to dismiss pursuant to Rule 12(b)(2), the court may look beyond the pleadings, including to affidavits and supporting materials, to determine whether it has jurisdiction. *Mende v. Milestone Tech., Inc.*, 269 F. Supp. 2d 246, 251 (S.D.N.Y. 2003).

In determining whether personal jurisdiction has been established, courts engage in a two-step analysis. *See Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 124 (2d Cir. 2002). First, district courts must determine if there is statutory jurisdiction, and second, "[i]f there is a statutory basis for jurisdiction, the court must then determine whether . . . extension of jurisdiction in such a case would be permissible under the Due Process Clause of the Fourteenth Amendment." *Id.* When a court is sitting in diversity, the "breadth of a federal court's personal jurisdiction is determined by the law of the state in which the district court is located." *Reich v. Lopez*, 38 F. Supp. 3d 436, 454 (S.D.N.Y. 2014) (quoting *Thomas v. Ashcroft*, 470 F.3d 491, 495 (2d Cir. 2006)).

## C. Rule 12(b)(5)

Rule 12(b)(5) authorizes a court to dismiss a complaint for insufficient service of process [*13] prior to a defendant filing an answer. *See* Fed. R. Civ. P. 12(b)(5). "In deciding a Rule 12(b)(5) motion, a Court must look to Rule 4, which governs the content, issuance, and service of a summons." *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 64 (S.D.N.Y. 2010). Under Rule 4(m), "[i]f a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time." Fed. R. Civ. P. 4(m). If the plaintiff is able to demonstrate good cause, a district court must grant a plaintiff an extension of time for service. *See id.* Even where a plaintiff does not show good cause, however, district courts may exercise discretion to grant an extension of time to effect adequate service. *See Zapata v. City of New York*, 502 F.3d 192, 196 (2d Cir. 2007); *George v. Prof'l Disposables Int'l, Inc.*, 221 F. Supp. 3d 428, 433 (S.D.N.Y. 2016). In determining whether to grant a discretionary extension, courts look to "(1) whether any applicable statutes of limitations would bar the action once refiled; (2) whether the defendant had actual notice of the claims asserted in the complaint; (3) whether defendant attempted to conceal the defect in service; and (4) whether defendant would be prejudiced by extending plaintiff's time for service." *DeLuca*, 695 F. Supp. 2d at 66.

Once a defendant moves to dismiss pursuant to Rule 12(b)(5), the plaintiff bears the [*14] burden of establishing that service was adequate. *See Khan v. Khan*, 360 F. App'x 202, 203 (2d Cir. 2010) (summary order). Although "[a] process server's affidavit of service constitutes prima facie evidence of proper service," this evidence may be rebutted by "[a] defendant's sworn denial of receipt of service." *Rana v. Islam*, 305 F.R.D. 53, 63 (S.D.N.Y. 2015) (quoting *Old Republic Ins. Co. v. Pac. Fin. Servs. of Am., Inc.*, 301 F.3d 54, 57 (2d Cir. 2002)); *see also Darden v. DaimlerChrysler N. Am. Holding Corp.*, 191 F. Supp. 2d 382, 387 (S.D.N.Y. 2002) ("Conclusory statements are insufficient to overcome a defendant's sworn affidavit that he was not served."). Courts may also look to materials outside of the pleadings when determining whether service was sufficient. *See Darden*, 191 F. Supp. 2d at 386 ("[I]n considering a motion to dismiss pursuant to 12(b)(5) for insufficiency of process, a Court must look to matters outside the complaint to determine whether it has jurisdiction.").

## D. Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

2018 U.S. Dist. LEXIS 95303, *14

alleged." *Id.* This standard demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Plausibility . . . depends [*15] on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC, 647 F.3d 419, 430 (2d Cir. 2011)*.

In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor. *Kassner, 496 F.3d at 237*. A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Iqbal, 556 U.S. at 678* (quoting *Twombly, 550 U.S. at 555*). Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.*

### IV. Discussion

The NAN and Verizon Defendants move to dismiss the Third Amended Complaint for lack of subject matter jurisdiction under Rule 12(b)(1), lack of personal jurisdiction under Rule 12(b)(2), insufficient service of process under 12(b)(5), and failure to state a claim under Rule 12(b)(6). Because "dismissal for lack of jurisdiction renders all other claims moot," *Darden, 191 F. Supp. 2d at 386*, I will consider the jurisdictional claims first, *see Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 583, 119 S. Ct. 1563, 143 L. Ed. 2d 760 (1999)* ("Article III generally requires a federal court to satisfy [*16] itself of its jurisdiction over the subject matter before it considers the merits of a case."). I thus address the jurisdictional claims raised by the Defendants based on Rule 12(b)(1), 12(b)(2), and 12(b)(5) before analyzing the merits of the case under Rule 12(b)(6).

#### A. Rule 12(b)(1)

As an initial matter, in their respective motions to dismiss, both the NAN and the Verizon Defendants, (NAN Defs.' Mem. 25; Verizon Defs.' Mem. 5-6),[6] argue

---

[6] "NAN Defs.' Mem" refers to the Memorandum of Law in

that the court lacks subject matter jurisdiction because Plaintiffs have not plausibly alleged that the amount in controversy meets the statutory requirement of $75,000 under § 1332.[7] New York law must be considered in determining the nature and extent of Plaintiffs' potential damages, since they allege state law claims under New York law. *See Bernshteyn, 2006 U.S. Dist. LEXIS 62689, 2006 WL 2516514, at *2*. Because I find that Plaintiffs have alleged, through both the Third Amended Complaint and his supplemental affidavit filed with his opposition, an amount-in-controversy in excess of $75,000 under the "hardly onerous" standard, *Scherer, 347 F.3d at 397*, I find that I have subject matter jurisdiction to hear Plaintiffs' claims.

#### B. Rule 12(b)(2)

The NAN Defendants also move to dismiss the action for lack of personal jurisdiction under Rule 12(b)(2). (*See* NAN Defs.' Mem. 7-11; NAN Defs.' Reply 9.) In New [*17] York, courts may exercise either specific or general personal jurisdiction. N.Y. C.P.L.R. §§ 301, 302. For general jurisdiction, a plaintiff's claims "need not arise out of defendant's contacts with the forum state, but defendant's contacts must be substantial." *Bohn v.*

---

Support of the Motion of Defendants Reverend Al Sharpton and National Action Network to Dismiss Plaintiffs' Third Amended Complaint, filed April 5, 2017. (Doc. 88.) "Verizon Defs.' Mem" refers to the Memorandum of Law in Support of the Motion to Dismiss Filed on Behalf of Verizon Communications Inc. and Cellco Partnership D/B/A Verizon Wireless, filed April 6, 2017. (Doc. 90.)

[7] Although the NAN Defendants acknowledge in their reply that they failed to include Rule 12(b)(1) as a basis for dismissal in their initial notice of their motion to dismiss, (*see* NAN Defs.' Reply 9-10; *see also* Doc. 85), the NAN Defendants include an argument for lack of subject matter jurisdiction in their memorandum of law in support of their motion to dismiss, (*see* NAN Defs.' Mem. 25). In any event, the Verizon Defendants have moved to dismiss pursuant to Rule 12(b)(1), (*see* Doc. 89, at 2), and lack of subject matter jurisdiction may be raised sua sponte regardless of whether it was argued in the parties' respective motions, *see Fountain v. Karim, 838 F.3d 129, 133 n.5 (2d Cir. 2016)* ("[A] district court can dismiss an action for lack of subject-matter jurisdiction under Rule 12(b)(1) sua sponte."). "NAN Defs.' Reply" refers to the Reply Memorandum of Law in Support of the Motion of Defendants Reverend Al Sharpton and National Action Network to Dismiss Plaintiffs' Third Amended Complaint, filed May 11, 2017. (Doc. 105.)

Page 6 of 10

2018 U.S. Dist. LEXIS 95303, *17

*Bartels*, 620 F. Supp. 2d 418, 425 (S.D.N.Y. 2007). With respect to specific jurisdiction a plaintiff's claim must arise out of defendant's contacts with the forum state even if those contacts are not substantial. *Id.* Further, a court may exercise specific jurisdiction over a non-domiciliary who "transacts any business within the state." N.Y. C.P.L.R. § 302(a).

The NAN Defendants argue that the court lacks personal jurisdiction over them because Plaintiffs failed to effect proper service on defendants and "[s]ervice of process is jurisdictional." (NAN Defs.' Mem. 11.) However, the NAN Defendants raise no arguments as to why I do not have specific or general personal jurisdiction over them under New York law. Because all of the actions that took place in connection with the alleged oral agreement between Anders and Sharpton occur in New York, including the meetings and the exchange of money, (see TAC ¶¶ 17-20), I find that I do have personal jurisdiction over the NAN Defendants. To the extent that the NAN Defendants argue [*18] that they were served improperly, I construe these arguments as arguments to dismiss the action pursuant to Rule 12(b)(5).

### C. Rule 12(b)(5)

The NAN Defendants move pursuant to Rule 12(b)(5) for insufficient service of process. (*See* NAN Defs.' Mem. 7-11.) As an initial matter, because Plaintiffs (1) failed to request an extension to effectuate service of the First Amended Complaint and (2) failed to show good cause for their failure to properly effectuate service, I question whether this case should not be dismissed under Rule 12(b)(5) for insufficient service of process. *See, e.g., George*, 221 F. Supp. 3d at 442-49; *Cassano v. Altshuler*, 186 F. Supp. 3d 318, 322-24 (S.D.N.Y. 2016).

Plaintiffs admitted in their November 30, 2016 letter that service was not properly effected on the NAN Defendants, and stated that they would "request[] an extension of time to effect proper service on defendants." (Doc. 38, at 1.) Plaintiffs again acknowledged deficient service at the pre-motion conference held on December 8, 2017 (the "December 8 Conference"), at which point it had been nearly 150 days since the opening of the case on July 15, 2017. Plaintiffs, however, never explicitly requested an extension of time to serve as they stated that they would, and provided no good cause for failure to timely serve the NAN Defendants. Although the issue of [*19] service was discussed at the December 8 Conference, and I allowed Plaintiffs to file an amended complaint, I did not make any rulings regarding an extension of time to serve pursuant to Rule 4(m). I thus find grounds for dismissal pursuant to Rule 12(b)(5) and Rule 4(m) for failure to timely effect service on the NAN Defendants. Even if the complaint were properly served, however, because Plaintiffs have failed to state any plausible claims, the action would be dismissed pursuant to Rule 12(b)(6), as detailed below.[8]

### D. Rule 12(b)(6)

Both the NAN Defendants and the Verizon Defendants move pursuant to Rule 12(b)(6) to dismiss this action for failure to state a claim. (*See* NAN Defs.' Mem. 11-25; Verizon Defs.' Mem. 7-21.) I analyze each of Plaintiffs' claims in turn below.

#### 1. Breach of Contract

Under New York law, for a successful breach of contract claim, a plaintiff must show (1) the formation of an agreement, (2) performance by one party, (3) breach of the agreement by the other, and (4) damages. *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 202 (S.D.N.Y. 2008). "A sufficient pleading for breach of contract must, 'at a minimum, allege the terms of the contract, each element of the alleged breach and the resultant damages in a plain and simple fashion.'" *Warren v. John Wiley & Sons, Inc.*, 952 F. Supp. 2d 610, 624 (S.D.N.Y. 2013) (quoting *Zaro Licensing, Inc. v. Cinmar, Inc.*, 779 F. Supp. 276, 286 (S.D.N.Y. 1991)). New York courts require plaintiffs to "plead the provisions [*20] of the contract upon which the claim is based"—in other words, "a complaint in a breach of contract action must set forth the terms of the agreement upon which liability is predicated." *Window Headquarters, Inc. v. MAI Basic Four, Inc.*, No. 91 Civ. 1816 (MBM), 1993 U.S. Dist. LEXIS 11245, 1993 WL 312899, at *3 (S.D.N.Y. Aug. 12, 1993); *see also Chrysler Capital Corp. v. Hilltop Egg Farms, Inc.*, 129 A.D.2d 927, 514 N.Y.S.2d 1002, 1003 (3d Dep't 1987) ("In an action to recover damages for

---

[8] Because I find that even if the service issue was cured, the Third Amended Complaint would be dismissed pursuant to Rule 12(b)(6), I decline to conduct an evidentiary hearing with respect to the issue of service of process.

breach of contract, the complaint must . . . set forth the terms of the agreement upon which liability is predicated, either by express reference or by attaching a copy of the contract.").

Further, oral contracts are "as enforceable as . . . written one[s]." *Charles Hyman, Inc. v. Olsen Indus., Inc., 227 A.D.2d 270, 642 N.Y.S.2d 306, 309 (1st Dep't 1996).* "As a practical matter, however, for all but the simplest of transactions, the burden of establishing the terms of the verbal contract—which falls to the proponent—presents a formidable obstacle to its enforcement." *Id.* (citations omitted). Thus, in the case of an oral contract, "[b]efore a court will impose [a] contractual obligation, it must ascertain that a contract was made and that its terms are definite." *Id.*; *see also Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp., 74 N.Y.2d 475, 548 N.E.2d 203, 548 N.Y.S.2d 920, 923 (1989)* ("Few principles are better settled in the law of contracts than the requirement of definiteness . . . [because] the requirement of definiteness assures that courts will not impose contractual obligations when the parties did not intend to conclude a binding agreement."). "A [*21] party alleging a breach of contract must demonstrate the existence of a contract reflecting the terms and conditions of their purported agreement," and there must be "a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Saul v. Cahan, 153 A.D.3d 947, 61 N.Y.S.3d 265, 268-69 (2d Dep't 2017)* (internal quotation marks omitted) (dismissing a case for failure to state a claim where the operative complaint "did not sufficiently allege a meeting of the minds with respect to the material terms" of an oral contract); *see also DeSilva v. N. Shore-Long Island Jewish Health Sys., Inc., No. 10-CV-1341 (JFB)(ETB), 2012 U.S. Dist. LEXIS 30597, 2012 WL 748760, at *8 (E.D.N.Y. Mar. 7, 2012)* (granting a motion to dismiss with respect to a breach of oral contract claim where "plaintiffs . . . do not allege the essential terms of the parties' purported contract in nonconclusory language" and merely stated in the operative complaint that the defendants "contracted to hire Plaintiffs and Class Members at a set rate of pay, with a minimum work schedule for a particular position, and under set terms of employment." (internal quotation marks omitted)).

Here, Anders alleges that he made an oral agreement with NAN and Sharpton. (*See* TAC ¶ 16.) The Third Amended Complaint further [*22] alleges that there was an exchange of $16,000 and that Anders discussed a strategy with NAN and Sharpton—including actions to be taken by NAN and Sharpton—after the exchange of the $16,000. (*See id.* ¶¶ 16-20.) Plaintiffs characterize what NAN and Sharpton were to do in exchange for the $16,000 in multiple ways—often in vague and imprecise language—throughout the Third Amended Complaint. He variously states that "Al Sharpton and NAN would ensure that Al Sharpton would do everything in his power to seek justice for the plaintiffs by doing whatever was necessary to rectify the injustice done by Verizon," (*id.* at ¶ 16); that Sharpton would arrange a meeting with Verizon's Chief Executive officer and "address the issues regarding Reggie Anders' treatment by Verizon," (*id.* ¶ 20); that Sharpton would "make a lot of noise via his media programs exposing them for discriminatory and racist practices" against Anders, (*id.*); that Sharpton would be "representing Reggie Anders," (*id.* ¶ 40); and that Sharpton and NAN would "contact Verizon . . . to settle a dispute out of court," (*id.* ¶ 49).

These various characterizations do not set forth the terms of the alleged contract with definiteness; therefore, [*23] Plaintiffs have failed to allege a "manifestation of mutual assent" that would "sufficiently allege a meeting of the minds" with respect to the terms of the oral agreement. *Saul, 61 N.Y.S.3d at 269* (quoting *Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp., 93 N.Y.2d 584, 715 N.E.2d 1050, 693 N.Y.S.2d 857, 860 (1999))*; *see also DeSilva, 2012 U.S. Dist. LEXIS 30597, 2012 WL 748760, at *8*. For example, it is unclear what the specific terms of the agreement were with respect to the actions that NAN and/or Sharpton were to take, the goal that NAN and/or Sharpton were supposed to accomplish, and how long NAN and/or Sharpton should attempt to achieve that goal. Accordingly, Plaintiffs' breach of contract claims fail, as Plaintiffs have failed to allege the "essential terms of the parties' purported contract." *DeSilva, 2012 U.S. Dist. LEXIS 30597, 2012 WL 748760, at *8* (quoting *Sirohi v. Trs. of Columbia Univ., No. 97-7912, 1998 U.S. App. LEXIS 22519, 1998 WL 642463, at *2 (2d Cir. Apr. 16, 1998)* (summary order)).

Further, I find that the alleged agreement, if enforced, would be contrary to public policy. "There is no magic formula for determining when a contract—or a particular provision of a contract—is void as against public policy." *SI Venture Holdings, LLC v. Catlin Specialty Ins., 118 F. Supp. 3d 548, 551 (S.D.N.Y. 2015)*. In New York, an agreement "may be unenforceable as contrary to public policy even in the absence of a direct violation of a criminal statute, if the sovereign has expressed a concern for the values underlying the policy implicated."

2018 U.S. Dist. LEXIS 95303, *23

*Id.* (quoting *Walters v. Fullwood*, 675 F. Supp. 155, 161 (S.D.N.Y. 1987)); *see also Szerdahelyi v. Harris*, 67 N.Y.2d 42, 490 N.E.2d 517, 499 N.Y.S.2d 650, 654 (1986) ("[I]llegal contracts, or those contrary to public policy, are unenforceable [*24] and . . . the courts will not recognize rights arising from them.").

Here, the means by which Anders initially attempted to obtain redress for his grievances after the dismissal of the two federal law suits is suspect.[9] Specifically, Anders sent the Verizon Defendants a demand letter stating that if the dispute did not get resolved "the community of Reverends would call for a boycott against Verizon with Reverend Al Sharpton leading the charge." (TAC ¶ 9.) The demand letter clearly suggested that Sharpton had already taken up Anders' cause—a suggestion that was not true since Anders and/or his representatives had not yet spoken to or made contact with Sharpton or his representatives. Such tactics are questionable at best, and raise concerns about Plaintiffs' motivations.

In any event, enforcing an agreement that, in effect, was attempting to pressure or coerce the Verizon Defendants to "settle [the] dispute"—either by "bring[ing] negative public attention," (TAC ¶ 49), "call[ing] for a boycott against Verizon," (*id.* ¶ 9), or "organiz[ing] boycotts and other activities which would shed negative light on Verizon," (*id.* ¶ 44), even after Anders' grievances had been heard and dismissed [*25] in prior lawsuits, would be against public policy. It would allow parties who have already had their day in court to enter into enforceable contracts in order to pursue another avenue to pressure their opponents, in direct contradiction of the purpose of res judicata. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326, 99 S. Ct. 645, 58 L. Ed. 2d 552 (1979) ("[R]es judicata . . . has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation."). There is no question that Sharpton and NAN were free to advocate on behalf of Plaintiffs if they believed Plaintiffs had been wronged; however, that does not mean that the courts can be used to enforce an oral agreement that required them to take such action under the circumstances presented here.

Because Plaintiffs have failed to establish the specific terms of the alleged oral agreement to a degree definite enough for me to impose a contractual obligation, and because I otherwise find the alleged agreement to be contrary to public policy, I find that Plaintiffs' breach of contract claim fails for want of a valid contract under New York law.

**2. Tortious Interference**

Under New York law, a claim for [*26] tortious interference "requires the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom." *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 668 N.E.2d 1370, 646 N.Y.S.2d 76, 82 (1996). The existence of a valid contract is the "most important element in this cause of action." *Long Island Pen Corp. v. Shatsky Metal Stamping Co.*, 94 A.D.2d 788, 463 N.Y.S.2d 39, 41 (2d Dep't 1983). With this element missing, Plaintiffs' cause of action against the Verizon Defendants for tortious interference with contract must also be dismissed.

In addition, this claim is based on pure speculation. There is no evidence that the Verizon Defendants were aware of the agreement between the NAN Defendants and Plaintiff—in fact, Plaintiff has provided no evidence linking the Verizon Defendants to Sharpton other than a New York Post article purportedly stating that "several large corporations including Verizon had given . . . Sharpton over $1 million for his birthday." (TAC ¶ 26.) This New York Post article is not attached to the Third Amended Complaint, and even if the article suggested that Verizon had made payments to Sharpton, Plaintiff has not provided evidence that the money [*27] was "hush money" other than his conclusory allegation that it was so. (*See id.*) Furthermore, Plaintiff's statement that NAN and Sharpton became disinterested in helping Plaintiff at a time that "seemed to coincide" with publication of the New York Post article, (*id.* ¶ 27), is not sufficient to create a reasonable inference that the Verizon Defendants were aware of the agreement as necessary for a tortious interference claim, and therefore does not allege a plausible claim of tortious interference. *See Int'l Minerals & Res., Inc. v. Pappas*, No. 87 Civ. 3988 (PKL), 1992 U.S. Dist. LEXIS 17588,

---

[9] I question whether Plaintiffs' actions approach extortive conduct, particularly in light of multiple prior dismissals of suits based on the same or substantially similar underlying facts. *See* N.Y. Penal Law § 155.05.

2018 U.S. Dist. LEXIS 95303, *27

1992 WL 354504, at *3 (S.D.N.Y. Nov. 17, 1992) ("Although a defendant need not be aware of all the details of a contract to be liable for tortious interference, it must have actual knowledge of a specific contract.").

### E. Leave to Replead

Rule 15(a) of the Federal Rules of Civil Procedure requires that courts grant leave to amend "when justice so requires." Fed. R. Civ. P. 15(a). "[I]t is within the sound discretion of the court whether to grant leave to amend." In re Alcon S'holder Litig., 719 F. Supp. 2d 280, 281 (S.D.N.Y. 2010) (quoting John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp., 22 F.3d 458, 462 (2d Cir. 1994)). Generally, when courts grant a motion to dismiss, amendments are favored because they "tend to facilitate a proper decision on the merits." Sokolski v. Trans Union Corp., 178 F.R.D. 393, 396 (E.D.N.Y. 1998) (internal quotation marks omitted). Thus, a plaintiff is typically granted leave to amend in the absence of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure [*28] to cure deficiencies by amendments previously allowed . . . or futility of amendment." Alcon, 719 F. Supp. 2d at 281-82 (quoting Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962)).

Given that I have provided Plaintiffs with multiple opportunities to amend their complaint, I find that it would be futile to allow Plaintiffs to amend once more. See Dyson v. N.Y. Health Care, Inc., 353 F. App'x 502, 503-04 (2d Cir. 2009) (summary order) (affirming a district court's dismissal of a third amended complaint where "the district court afforded [the plaintiff] three opportunities to file an amended complaint" but "despite these, she did not plead any facts sufficient to show that she was plausibly entitled to any relief"); Best v. City of New York, No. 12 Civ. 7874(RJS)(SN), 2014 U.S. Dist. LEXIS 5491, 2014 WL 163899, at *3 (S.D.N.Y. Jan. 15, 2014) ("Plaintiff has been given ample opportunity to amend his pleadings and the Court can only afford him so many bites at the apple."). Accordingly, Plaintiffs are denied leave to amend the Third Amended Complaint.

### V. Conclusion

Because I find that Plaintiffs have not established the existence of a valid contract under New York law, the NAN and Verizon Defendants' motions to dismiss are GRANTED and I dismiss Plaintiffs' breach of contract and tortious interference claims with prejudice. The Clerk of Court is respectfully directed to enter judgment for Defendants and close this case.

SO ORDERED.

Dated: June 5, 2018

New York, New York [*29]

/s/ Vernon S. Broderick

Vernon S. Broderick

United States District Judge

---

End of Document